IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Mary Harris, | ) | C/A No.: 1:11-2442-TMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

  A.    Procedural History

On March 17, 2008, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on September 10, 2007.  Tr. at 127–28, 131–38.  Plaintiff later amended her onset date to February 1, 2008.  Tr. at 158.  Her applications were denied initially and upon reconsideration.  Tr. at 87, 93.  On September 28, 2009, Plaintiff had a hearing before an Administrative Law Judge ("ALJ").  Tr. at 49–86 (Hr'g Tr.).  The ALJ issued an unfavorable decision on January 8, 2010, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 15–23.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 12, 2011.  [Entry #1].

  B.    Plaintiff's Background and Medical History

    1.    Background

Plaintiff was 54 years old at the time of the hearing.  Tr. at 53.  She graduated from high school and attended beauty school.  Tr. at 57.  Her past relevant work ("PRW") was as a food prep person and a hair stylist.  Tr. at 80.  She alleges she has been unable to work since February 1, 2008.  Tr. at 158.

    2.    Medical History

Plaintiff received her primary treatment care from St. Luke's Free Medical Clinic

2

("St. Luke's").   She received treatment for routine medical conditions as well as her chronic impairments including asthma, obesity, hypertension, and allergic rhinitis.   The record contains numerous visits and medication refills for these conditions between 2004 and 2007.   Tr. at 493–99, 637–64.   The record also documents numerous emergency room visits for asthma, back and neck pain, depression, panic attacks, a car accident, and routine medical conditions from 2002 through 2007.   Tr. at 277–441, 458–67, 470–84, 510–58.

Plaintiff presented to St. Luke's on February 14, 2008 with complaints of a cough, runny nose, watery eyes, and chills.   Tr. at 492.   A chest x-ray showed Plaintiff had a normal heart size, clear lungs, and no effusions.   Tr. at 503.   She was diagnosed with an upper respiratory infection and prescribed medication.   Tr. at 492.

On June 5, 2008, Pranay Patel, M.D., examined Plaintiff at the request of the state agency.   Tr. at 560–63.   Plaintiff complained of asthma since 2004, often triggered because she worked in cosmetology.   Tr. at 560.   She also complained of allergies, frequent panic attacks, history of an abdominal hernia, chronic bronchitis, lower back pain since 2007, history of lower right foot and heel pain due to standing all day, the need for bifocals, and headache "off and on."   Tr. at 560–61.   Dr. Patel found Plaintiff was morbidly obese and noted she had crying spells during her evaluation.   Tr. at 561.   She was 66 inches tall and weighed 246 pounds.   *Id.*   She had 20/20 visual acuity bilaterally and had "mostly clear" lungs with a "few" expiratory wheezes at the bases.   *Id.* at 561–62.   She had no calf tenderness or extremity edema.   Tr. at 562.   She had a ganglion cyst

3

in her left wrist and "slight" discomfort in her right heel, but no right foot deformities or range of motion or weight-bearing abnormalities. *Id.* She had full strength and equal motor and sensory functioning throughout. *Id.* Plaintiff's back felt tight when bending or lying down. *Id.* She had negative straight leg raising tests and "slightly restricted" spinal ranges of motion because of pain and weight. *Id.* Dr. Patel diagnosed abdominal wall umbilical hernia; pain in her middle and lower back, and right foot; morbid obesity; and chronic asthma, allergic rhinitis, panic attacks, bronchitis, and headaches. *Id.* He noted Plaintiff's asthma was stable on medications, but might be triggered by the chemicals she used at work. Tr. at 563. He recommended a psychological evaluation, imaging studies of her back, physical therapy, and weight loss. *Id.* He also said she might need to change jobs. *Id.*

On July 11, 2008, Seham El-Ibiary, M.D., a state agency physician, reviewed the evidence and completed a Physical Residual Functional Capacity ("RFC") Assessment wherein she stated Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand, walk, or sit about six hours in an eight-hour workday; and should avoid concentrated exposure to fumes, odors, dust, poor ventilation, etc. Tr. at 564–71.

On June 12, 2008, Plaintiff presented to St. Luke's with complaints of depression. Tr. at 603. Examination showed she had clear lungs. *Id.* Asthma, anxiety, and allergic rhinitis were diagnosed and medications were prescribed. *Id.*

On June 20, 2008, Cassie Grier, a therapist with Westgate Training and

4

Consultation Network ("Westgate"), wrote a Narrative Summary in which she stated she first saw Plaintiff on October 8, 2007 for evaluation of anxiety and panic attacks. Tr. at 573–75. Plaintiff reported working at her current job, Hair Plus, for six years, but stated that her new manager was causing her severe stress. Tr. at 573. She reported that her manager, a female, made sexual advances toward her and she repeatedly asked her to stop. *Id.* Plaintiff complained of difficulty sleeping and worrying about this woman, noting the manager wrote her up several times for infractions since she confronted her about the sexual harassment. *Id.* Plaintiff denied suicidal or homicidal ideation or problems with her appetite, but reported poor sleep. *Id.* She reported normal energy level and motivation, but stated she had anxiety and panic attacks. *Id.* Plaintiff stated she attended church and was attending Spartanburg Community College for a degree in art. Tr. at 573–74. Ms. Grier reported seeing Plaintiff eight times since her first appointment. Tr. at 574. She said Plaintiff presented with normal appearance, motor behavior, speech, thought, intellect, judgment, and impulse control, and good attention, concentration, and memory. *Id.* She said Plaintiff usually had a smiling demeanor and "appear[ed] to be benefit[t]ing from [her] sessions." *Id.* Plaintiff reported having a better sense of self and gaining control of her panic attacks. *Id.* Ms. Grier stated Plaintiff had panic disorder without agoraphobia. *Id.* She said she had a beginning GAF score of 61 and a current GAF score of 75 and recommended continued counseling. *Id.* She felt Plaintiff was making progress and was in better control of her panic attacks. *Id.*

On July 1, 2008, James Ruffing, Psy.D., examined Plaintiff at the request of the

5

state agency. Tr. at 577–80. Plaintiff complained of panic attacks, depression, and anxiety and feeling like she was "going to fail out of school" because of difficulties focusing and concentrating. Tr. at 577. Plaintiff reported working at Hair Plus as a stylist, but stated that her hours and income had decreased significantly. *Id.* Plaintiff reported that she spent her time at work, attending school, caring for her child, and attending therapy. Tr. at 578. She said she cared for her own personal needs, drove a car, attended church, paid bills, used the telephone, prepared meals, cleaned her house, and did laundry. *Id.* Dr. Ruffing found Plaintiff was adequately groomed and dressed. *Id.* She had spontaneous, responsive, articulate, and fluent speech, but was rather pressured due to her emotional state and was acutely distressed. *Id.* She had an intense, highly agitated, and depressed affect and endorsed symptoms of major depression. *Id.* She appeared "very overwhelmed" with her current life situation and described having panic attacks at least five times per week. Tr. at 578–79. She was fully oriented and had relevant, coherent, and goal-directed thought processes and a tendency toward disorganized and tangential thought processes due to her intensity and pressure. Tr. at 579. She demonstrated no psychosis, lack of reality contact, delusions, paranoia, or hallucinations. *Id.* Dr. Ruffing noted Plaintiff's abilities to attend and focus seemed significantly impaired by her level of agitation. *Id.* She had intact memory and ability for simple calculations, basic general knowledge, and responded appropriately to questions. *Id.* Dr. Ruffing diagnosed panic disorder without agoraphobia and recurrent, moderate major depressive disorder. *Id.* He noted that she demonstrated significant

emotional instability and encouraged her to immediately seek treatment with St. Luke's. *Id.* He opined that Plaintiff would "struggle to perform more than simple to repetitive tasks or to consistently understand, remember, and carry out more than simple instructions." Tr. at 579–80. He said she would likely decompensate under increasing stress and would struggle to manage the concentration, persistence, and pace required in a typical work environment. Tr. at 580.

On July 10, 2008, Robbie Ronin, Ph.D., a state agency psychologist, reviewed the evidence and completed a Psychiatric Review Technique ("PRT"). Tr. at 581–94. He found Plaintiff had medically-determinable impairments of depression and panic disorder without agoraphobia. Tr. at 584, 586. He opined that Plaintiff had a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation. Tr. at 591. He completed a Mental RFC Assessment wherein he opined that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and make simple work-related decisions. Tr. at 596. He further opined that she would have difficulty relating appropriately to the general public, completing a normal work week without interruptions from psychologically-based symptoms, and responding appropriately to changes in the work setting. Tr. at 596. Dr. Ronin stated that Plaintiff would be able to carry out short and simple instructions, would be able to respond appropriately to co-workers and supervisors, and would have "a small amount of

7

difficulty making work related changes." Tr. at 597.

On August 28, 2008, Plaintiff returned to St. Luke's with complaints of panic attacks. Tr. at 602. Examination revealed clear lungs. *Id.* Plaintiff was diagnosed with anxiety, depression, asthma, and hypertension and prescribed medications. *Id.*

On September 19, 2008, Larry Clanton, Ph.D., a state agency psychologist, reviewed the evidence and completed a PRT. Tr. at 607–20. His findings were the same as those of Dr. Ronin. *Id.* Dr. Clanton also completed a Mental RFC Assessment wherein he opined that Plaintiff was moderately limited in her ability to understand and carry out detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public. Tr. at 629–32. He stated that Plaintiff could understand short and simple instructions, but would work best in situations that did not require ongoing interaction with the public. Tr. at 631. That same day, Dale Van Slooten, M.D., a state agency physician, reviewed the evidence and completed a Physical RFC Assessment. Tr. at 621–28. His findings were the same as those of Dr. El-Ibiary. *Id.*

On September 26, 2008, Ms. Grier wrote a letter to Plaintiff's attorney wherein she stated she met with Plaintiff 14 times over the last year for treatment related to Plaintiff's anxiety and panic attacks. Tr. at 633. She said Plaintiff was cooperative and compliant with treatment, but continued to report depression. *Id.* She said Plaintiff was "not able to work enough hours to earn the income to pay her increasing bills." *Id.*

On November 4, 2008, Plaintiff presented to St. Luke's with complaints that her

8

asthma was bothering her due to exposure to fumes from the beauty shop where she worked.  Tr. at 636.  Plaintiff was instructed to consider retraining and was prescribed medication.  *Id.*

On February 19, 2009, Plaintiff presented to Walter Grady, D.O., for a medical evaluation of her lumbar spine.  Tr. at 667–72.  She complained of lower back pain extending into her left leg.  Tr. at 667.  Dr. Grady noted Plaintiff's lower back pain might be secondary to being bent over shampooing clients all day long.  *Id.*  She reported working between six and seven hours per day for six-and-a-half years, but said her schedule was cut down to 24 hours per week for the prior eight to nine months.  *Id.*  She reported that at least five days per week after work, she experienced pain and difficulty getting out of bed and felt instability with walking and standing.  Tr. at 668.  She stated she first reported her back pain to her manager in June 2007 and rated it as an eight to nine on a ten-point scale.  *Id.*  Plaintiff reported that she worked a regular schedule, but said "everybody's schedule [was] being cut."  *Id.*  Dr. Grady found Plaintiff had no gross kyphoscoliotic deformities in her lumbar spine, but that she had slight kyphosis at T4–5.  Tr. at 670.  She had tenderness to palpation from L1 down to L5–S1 and tenderness in the bilateral SI joint region, more profoundly on the left.  *Id.*  She ambulated with a normal heel-to-ball of foot gait and could heel walk with an element of difficulty.  *Id.*  She had full motor strength, except for in her left extensor hallucis longus, which was 3+ to 4/5.  *Id.*  She had normal reflexes, hyperesthesia on the left compared to the right, positive straight leg raising test on the left with sacroiliac joint pain, and symmetrical leg lengths

9

bilaterally.  Tr. at 670–71.  Dr. Grady diagnosed chronic element of low back pain with an element of bilateral sacroiliitis, left greater than the right, also including an element of left sciatica.  Tr. at 671.  He also diagnosed weakened extensor hallucis longus strength on the left, hyperesthesia at L4–L5 and S1 dermatomes on the left, and sciatic tension signs on the left.  *Id.*  He recommended imaging studies and treatment with non-steroidal anti-inflammatories.  *Id.*  He stated that there was a "causal relationship relative to [Plaintiff's] stated on the job issues/injury and her current medical condition, at least from an aggravating point of view."  Tr. at 672.  He assigned Plaintiff a 17 percent impairment rating for her lumbar spine and a whole person impairment rating of 13 percent.  *Id.*

Plaintiff presented to the emergency room on March 14, 2009, with complaints of chemical exposure while pumping gasoline.  Tr. at 680–82.  She was diagnosed with hydrocarbon exposure and anxiety and told that she could return to work the following day.  Tr. at 673, 682.

On July 2, 2009, Ms. Grier wrote another letter to Plaintiff's attorney wherein she stated she saw Plaintiff five times since September 26, 2008.  Tr. at 683.  She said that during this time, Plaintiff was in distress concerning her housing situation, experiencing panic attacks and depression, and binge eating.  *Id.*  She reported last seeing Plaintiff on March 19, 2009, but noted that Plaintiff missed her following appointment and she had not heard from Plaintiff since then.  *Id.*

Plaintiff presented to the emergency room on July 5, 2009 complaining of anxiety

10

and requesting a medication refill.  Tr. at 686–87.  Her prescriptions were refilled and she was discharged.  *Id.*

On August 21, 2009, Ms. Grier wrote another letter to Plaintiff's attorney wherein she stated she had only seen Plaintiff once since July 2, 2009 and the only change was that there was a fire at her home.  Tr. at 693.  She stated that she did "not feel qualified to complete a medical assessment concerning [Plaintiff's] ability to work."  *Id.*  On August 31, 2009, Ms. Grier wrote a letter in which she stated she saw Plaintiff 20 times between October 26, 2007 and July 24, 2009.  Tr. at 694.  She stated Plaintiff had panic disorder without agoraphobia, but had benefited from therapy with decreased panic attacks.  *Id.* She said that, in an average month, Plaintiff might have three weeks where she could handle ordinary work stresses well.  *Id.*  However, if some unusual stress came up, she could enter a period of perhaps one week where she could not even tolerate ordinary work stresses.  *Id.*  Ms. Grier stated Plaintiff would likely have trouble sleeping and concentrating during this period.  *Id.*  In other words, she might have a period of one week per month where she could not attend to work tasks.  *Id.*  Ms. Grier noted that while she had previously assessed Plaintiff with a GAF score of 75, Plaintiff exhibited that score on her "good days" and would have at least three days out of an average month where her GAF score would drop to 50 due to her panic attacks.  *Id.*  Ms. Grier stated she "d[id] not think [Plaintiff was] capable of maintaining a full time job due to her emotional limitations alone, even excluding the effects of her physical problems."  *Id.*

11

3.      Other Evidence

On July 15, 2009, Elizabeth Garcia, Plaintiff's manager, completed a Work Activity Questionnaire, wherein she stated Plaintiff could not complete all of her job duties without special assistance. Tr. at 265. She said that Plaintiff did not complete her work in the same amount of time as employees in similar positions. *Id.* She said Plaintiff received fewer or easier duties, less hours, and special equipment (fans). *Id.* She stated Plaintiff performed at 50 percent or less of other employees' productivity, but she was not paid more than an employee in a similar position. Tr. at 266. She said Plaintiff was not frequently absent from work, could not be around harsh cleaning chemicals, and her work was satisfactory when compared to another employee in a similar position. *Id.*

On September 11, 2009, Ms. Garcia wrote a letter in which she stated Plaintiff worked six hours per day, four days a week, and because of her medical problems, she treated her somewhat differently than she did other employees. Tr. at 272. She said she did not bother Plaintiff with small tasks. *Id.* She said Plaintiff appeared to be in pain and became "winded with just the smallest task." *Id.* She described Plaintiff as sweating "quite a bit" when exerting herself. *Id.* She said she allowed Plaintiff to take frequent breaks and miss more days of work than she would otherwise because she wanted Plaintiff to be able to support her family. *Id.* She stated she did not think Plaintiff could work full time. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the September 28, 2009 hearing, Plaintiff testified that she lived with her 13-year-old daughter and worked 23–24 hours per week as a hair stylist at Hair Plus.  Tr. at 54–55.  She stated she previously had three worker's compensation injuries consisting of torn cartilage in her rib cage in 1994–95, a rotator cuff injury in 1998–99, and a lumbar sprain in 2007.  Tr. at 55–57.  She testified that she did not have medical insurance.  Tr. at 57.

Plaintiff stated that when she began working at Hair Plus in 2002, she worked 30–37 hours per week.  Tr. at 58.  She testified she could not work full time as of the date of the hearing because the sprays and fumes bothered her and she had pain in her back and cataracts in her eyes.  Tr. at 59–60.  She said she took more breaks than other employees and called in sick approximately once a month.  Tr. at 69–70.  She stated that her productivity and earnings had gone down at work because she could not work with as many chemicals as she used to and because she spaced her appointments out more than she used to.  Tr. at 76–77.

She stated that she visited her sister-in-law, attended church monthly, drove, read, sketched, cooked, washed dishes, went to the laundromat and grocery shopping, and swept.  Tr. at 61–63.  She said she did not vacuum or mop.  Tr. at 62.  She testified she

could stand for about 20 minutes at a time and sit for 15 minutes.  Tr. at 70, 72.  She said she also had memory problems.  Tr. at 76

Plaintiff testified she felt she was disabled because she had panic attacks, depression, asthma, low back sprain, and pain radiating into her legs.  Tr. at 64.  She stated that people coming into the beauty shop for haircuts did not bother her.  Tr. at 66.  She said she worked even though she did not feel well because she is the only parent and she and her daughter would otherwise be homeless.  *Id.*  She testified that she had been to the hospital "a lot of times" for asthma attacks and usually was required to stay overnight.  Tr. at 67.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Mark Leaptrot reviewed the record and testified at the hearing.  Tr. at 79–85.  The VE categorized Plaintiff's PRW as a food prep person and hair stylist as light.  Tr. at 80.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work; frequently climb, crouch, and crawl; must avoid concentrated exposure to fumes, odors, gas, dust, and poor ventilation; and was limited in understanding and carrying out detailed instructions.  *Id.*  The VE testified that the hypothetical individual could perform Plaintiff's PRW as a food preparer, but stated that a hair stylist required detailed instructions and is listed as a significant factor for fumes.  Tr. at 80–81.  The ALJ then stated that he would not include the limitation for understanding detailed instructions for a job that Plaintiff had been doing for years.  Tr. at 81.  The VE responded that "with those conditions," Plaintiff could perform PRW.  *Id.*

14

The ALJ asked whether there were any other jobs that the hypothetical person could perform. *Id.* The VE identified the following light, unskilled jobs: shipping and receiving weigher (222.387-074) (1,100 jobs in South Carolina; 96,000 nationally); garment sorter (DOT 222.687-014) (3,000 jobs in South Carolina; 180,000 nationally); and information clerk (DOT 237.367-018) (2,400 jobs in South Carolina; 144,000 nationally). Tr. at 82. The VE stated that these jobs were representative and consistent with the Dictionary of Occupational Titles. *Id.*

Upon questioning by Plaintiff's counsel, the VE stated that the restriction of the hypothetical individual to avoid concentrated exposure to fumes, odors, and gases would preclude Plaintiff's PRW as a hair stylist. Tr. at 83. He also testified that four breaks of 10–12 minutes in addition to regularly-scheduled breaks or more than three absences per month would be considered excessive absenteeism. Tr. at 84–85. The VE stated that being off-task 16 percent of the day would affect employability. Tr. at 85. He also testified that if the hypothetical individual was moderately limited in the ability to make simple work-related decisions and to respond appropriately to changes in the work environment, employment would be precluded. *Id.*

2.     The ALJ's Findings

In her January 8, 2010 decision, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

15

2.    The claimant has not engaged in substantial gainful activity since February 1, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: asthma, obesity, sciatica, major depression and an anxiety disorder with panic attacks (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently.  The claimant can stand or walk for at least six hours per eight-hour workday and can sit for at least six hours per workday.  The claimant can frequently climb, crouch and crawl, and must avoid concentrated exposure to fumes, gases, odors and dust.  She has some moderate limitations with understanding and carrying out detailed instructions.

6.    The claimant is capable of performing some past relevant work (20 CFR 404.1565 and 416.965).

7.    In addition, the claimant was born on April 7, 1955 and was 52 years old, which is defined as an individual closely approaching advanced age, on the allege disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    The claimant has no skills that would transfer to other work and transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR part 404, Subpart P, Appendix 2).

10.    Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2008 through the date of this decision (20 CFR 404.1520(g) and 416.930(g)).

Tr. at 17–23.

16

D.    Appeals Council Review

Plaintiff submitted additional evidence to the Appeals Council. On January 19, 2010, she followed up with Dr. Grady for evaluation of the change of condition of her lumbar spine and lower back region. Tr. at 696–702. Dr. Grady noted that Plaintiff had not received any of the treatment he recommended on February 19, 2009. Tr. at 696. Plaintiff's chief complaint was lower back pain radiating down to her knees bilaterally. *Id.* Dr. Grady indicated that Plaintiff could climb a ladder, reach overhead, and take out the trash at work. Tr. at 697. Plaintiff stated that a new supervisor at work no longer kept her on light duty and had added duties to her job. *Id.* She described her lumbar spine pain as a 7 out of 10. *Id.* Her straight leg raise test was slightly atypical on the right, but demonstrated SI joint pain extending into the buttocks and thigh on the left. *Id.* Plaintiff's right leg was shorter than her left, which was a change from the equal and symmetrical findings at the prior visit. Tr. at 699. Examination revealed tenderness stemming from L2–3 down to L5–S1 and in her bilateral SI joint regions. *Id.* Dr. Grady noted that Plaintiff's extension was less than on the prior visit, but her range of motion and side bending remained the same. Tr. at 700. Plaintiff was able to ambulate in a stable fashion. *Id.* Her hip flexion strength, knee extension strength, and ankle dorsiflexion strength was essentially normal. *Id.* Dr. Grady diagnosed chronic element of low back pain with an element of bilateral sacroiliitis, left greater than the right, also including an element of left sciatica. Tr. at 701. He also diagnosed hyperesthesia at L4-L5 and S1 dermatomes on the left, and sciatic tension signs on the left. *Id.* He again

17

recommended imaging studies and treatment with non-steroidal anti-inflammatories and opined that there was a causal relationship between Plaintiff's workplace injury and current medical condition.  *Id.*

Plaintiff presented to St. Luke's on March 23, 2010 for a refill of her medication. Tr. at 725.  She was treated in the emergency room for anxiety and panic attacks on April 16, 2010.  Tr. at 713–17.  On April 22, 2010, Plaintiff was again treated at St. Luke's for anxiety and panic attacks related to her house fire, her missing dog, and the loss of her job.  Tr. at 724.  The treater increased her Prozac.  *Id.*

On May 11, 2010, Elizabeth Martin, a family therapy graduate student with Westgate, wrote a letter stating she had seen Plaintiff four times since March 19, 2010, and had diagnosed her with adjustment disorder with mixed anxiety and a chronic depressed mood.  Tr. at 728.

On January 18, 2011, Stephen Kana, M.D., treated Plaintiff for rib, right shoulder, and left knee pain after a fall in December.  Tr. at 769–70.  On examination, Plaintiff could take her neck through a full range of motion without pain.  Tr. at 769.  She had pain in her arm at the extremes of forward flexion and abduction. *Id.*  Her left knee had a range of motion of zero to 95 degrees.  Tr. at 769–70.  Dr. Kana diagnosed questionable non-displaced fibular fracture versus meniscal pathology of the left knee and right shoulder possible rotator cuff tear versus shoulder contusion.  Tr. at 770.  He ordered MRIs and released Plaintiff to light work with no lifting over five pounds, pushing, pulling, overhead work, squatting, kneeling, or stairs.  Tr. at 768.  An MRI of Plaintiff's

18

right shoulder on February 7, 2011 revealed supraspinatus followed by infraspinatus hypertrophic tendinosis, long-head biceps tendinosis, pronounced concavity of the articular aspect of the acromion with mild acute on primarily chronic AC arthropathy, and no rotator cuff muscle helly atrophy.  Tr. at 771.  An MRI of Plaintiff's left knee revealed no meniscal tear, severe cartilage loss of the weight-bearing medial femoral condyle, erosion or a cyst along the lateral acetabular roof, probable benign chondroid or chondroid-myxoid lesion of the central tibia, small-caliber knee joint effusion, and possible grade one strain of the MCL.  Tr. at 773.

Ms. Martin sent another letter on February 25, 2011 reporting that she had seen Plaintiff 30 times since May 14, 2010.  Tr. at 754.  She noted that Plaintiff was making good grades as a part-time college student and was also working two part-time jobs.  *Id.* She stated that Plaintiff had debilitating panic attacks, but that she had several coping strategies she seemed to use well.  *Id.*  One coping strategy was her dog, who had recently been stolen or run away, causing Plaintiff's anxiety to increase for a period of time.  *Id.*  Ms. Martin indicated that Plaintiff had a low attention span and often jumped from topic to topic.  *Id.*

Plaintiff followed up with Dr. Kana on February 15, 2011 and reported she was miserable with her knee.  Tr. at 764.  She also complained of some back pain.  *Id.*  Dr. Kana recommended a cortisone injection and physical therapy.  Tr. at 765.

On March 18, 2011, Plaintiff saw Dr. Kana for follow up on her knee arthritis, impingement syndrome, and high-grade rotator cuff tear.  Tr. at 759.  Dr. Kana indicated

19

Plaintiff was doing well and advised continued therapy. *Id.* He permitted Plaintiff to return to "light work" with no pushing, pulling, squatting, kneeling, long-term standing, or lifting over five pounds. Tr. at 762.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      The ALJ failed to consider whether to apply the more favorable Grid rule where Plaintiff's age was borderline on the date of the ALJ's decision;

2)      The ALJ failed to acknowledge or consider the lay witness statements of Plaintiff's work supervisor;

3)      The ALJ failed to properly consider the opinions of Ms. Grier and Dr. Ruffing;

4)      The ALJ failed to properly consider the effects of Plaintiff's obesity; and

5)      The ALJ presented an incomplete hypothetical to the VE.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

20

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step.).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982).  The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g).

22

The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

    1.     The ALJ's Failure to Consider Ms. Garcia's Statements is Reversible Error

Plaintiff argues the ALJ failed to consider the statement of Ms. Garcia, her manager at Hair Plus, regarding her work abilities.  [Entry #22 at 19–21].  The Commissioner responds that while the ALJ did not specifically address Ms. Garcia's statements, she expressly stated that she considered "all the evidence" and "the entire record" in making her findings of fact and conclusions of law.  [Entry #23 at 19].  The Commissioner further contends that because Ms. Garcia's statements were similar to Plaintiff's testimony, which the ALJ reasonably discounted, any error in not discussing Ms. Garcia's statement was harmless.  *Id.* at 23.  Plaintiff counters that the error was not harmless because Ms. Garcia's statement could have affected the ALJ's finding that Plaintiff could return to PRW and, in conjunction with the ALJ's failure to apply the advanced-age Grid rule, could have affected the outcome of the case.  [Entry #25 at 5].

Pursuant to SSR 96-7p, in determining the credibility of a claimant's statements, the ALJ must consider the entire case record including statements from "other persons about the symptoms and how they affect the individual."  SSR 96-7p.  Other persons may include non-medical sources such as spouses, parents, caregivers, siblings, other relatives, friends, neighbors, and clergy.  20 C.F.R. § 404.1513(d).  These lay witnesses "may provide [statements] about how the symptoms affect [a claimant's] activities of daily living and [her] ability to work. . . ."  20 C.F.R. § 404.1529(a).

Ms. Garcia completed a Work Activity Questionnaire on July 15, 2009, wherein she stated Plaintiff could not complete all of her job duties without special assistance, did not complete her work in the same amount of time as employees in similar positions, and received fewer or easier duties, less hours, and special equipment (fans).  Tr. at 265.  She stated Plaintiff performed at 50 percent or less of other employees' productivity, but she was not paid more than an employee in a similar position.  Tr. at 266.  She said Plaintiff was not frequently absent from work, could not be around harsh cleaning chemicals, and her work was satisfactory when compared to another employee in a similar position.  *Id.*

On September 11, 2009, Ms. Garcia wrote a letter in which she stated Plaintiff worked six hours per day, four days a week, and because of her medical problems, she treated her somewhat differently than she did other employees.  Tr. at 272.  She said she did not bother Plaintiff with small tasks and that Plaintiff appeared to be in pain and became "winded with just the smallest task."  *Id.*  She said she allowed Plaintiff to take frequent breaks and miss more days of work than she would otherwise because she wanted Plaintiff to be able to support her family and did not think Plaintiff could work full time.  *Id.*

The Commissioner concedes Ms. Garcia's statements "were similar to Plaintiff's testimony."  [Entry #23 at 23].  Nonetheless, the ALJ failed to reference this evidence in assessing, and ultimately discounting, Plaintiff's subjective complaints.  On the contrary, the ALJ relied heavily on Plaintiff's work history in finding Plaintiff not disabled despite Ms. Garcia's statements indicating that Plaintiff was working with significant

25

accommodations. For example, in discounting Plaintiff's credibility, the ALJ cited Plaintiff's testimony that she worked "twenty-three to twenty-four hours per week as a hairstylist in six hour shifts, four days per week." *See* Tr. at 19. In discounting the opinions of Dr. Ruffing and Ms. Grier, the ALJ likewise relied on Plaintiff's "continued regular work activity." Tr. at 21. The ALJ also found "based on the claimant's continued work activity and her statements that she has no problems working with the public, there is little indication that the claimant's mental impairments present her with any significant work-related limitations." *Id.*

Because the ALJ relied on Plaintiff's ability to work without acknowledging the limitations and accommodations noted by Ms. Garcia, the undersigned recommends this case be remanded for the ALJ to analyze Ms. Garcia's statements. While an ALJ need not discuss every piece of evidence submitted, *Jackson v. Astrue*, 8:08-2855-JFA, 2010 WL 500449, *10 (D.S.C. Feb. 5, 2010), the ALJ's failure to recognize or assess Ms. Garcia's statements renders the court unable to determine whether the ALJ's decision is supported by substantial evidence.

      2.    The ALJ Failed to Properly Evaluate Plaintiff's Borderline Age Situation

Plaintiff argues that because she turned 55 years old less than three months following the ALJ's decision, she presented a borderline age situation for purposes of evaluation under the Medical-Vocational Guidelines ("Grids"). [Entry #22 at 18–19]. She contends the ALJ erred in failing to apply the advanced-age Grid rule, which would

have directed a finding of disability as a matter of law. *Id.* at 18. The Commissioner responds that the ALJ denied Plaintiff's claim at step four of the sequential evaluation (return to PRW) and made only an alternative finding at step five. [Entry #23 at 23–24]. Thus, the Commissioner argues that any error at step five was harmless. *Id.* Plaintiff concedes that the error is harmless unless she can show the ALJ erred in finding she could return to her PRW at step four. [Entry #25 at 1–2]. She contends, however, that the ALJ erred at step four by failing to properly consider Ms. Garcia's statement and the opinions of Ms. Grier and Dr. Ruffing making the error at step five significant in this case. *Id.*

The Appeals Council Interpretations provide the following guidance in borderline age situations:

> To identify borderline age situations when making disability determinations, adjudicators will apply a two-part test:
>
> (1) Determine whether the claimant's age is within a few days or a few months of a higher age category.
>
> (2) If so, determine whether using the higher age category would result in a finding of "disabled" instead of "not disabled.
>
> . . . If the answer to both questions is "yes," a borderline age situation exists and the adjudicator must decide whether it is more appropriate to use the higher age or the claimant's chronological age.

HALLEX II–5–3–2.

Here, Plaintiff was less than three months from a higher age category at the time of the ALJ's decision bringing her within a borderline age situation. *See Bush v. Astrue*,

27

2008 WL 867941 (S.D.W.V. March 28, 2008) ("Generally, it appears that Claimants are in a borderline situation when they are about six months from an older age category.") (citations omitted).   In applying the Grids applicable to light work, Rule 202.14 (individual closely approaching advanced age with skilled or semi-skilled work experience and no transferable skills) would indicate a finding of "not disabled," whereas Rule 202.06 (individual of advanced age with skilled or semi-skilled work experience and no transferable skills) would indicate a finding of "disabled."   20 C.F.R. Pt. 404, Subpt. P, App. 2.   Given the borderline age situation and the disability finding when using the older age category, the ALJ should have decided whether it was more appropriate to use the higher age category or the claimant's chronological age.   *See also* 20 C.F.R. § 404.1563(b) ("If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.").   Such an analysis is absent from the record, rendering the court unable to determine how or why the ALJ decided to apply the Plaintiff's chronological age category instead of the higher age category.

The Commissioner argues that this error by the ALJ was harmless because she found Plaintiff not disabled at step four and her step five analysis was an alternative holding.   While the Commissioner's harmless error argument may be convincing where the step four analysis was supported by substantial evidence, the ALJ's failure to consider

Ms. Garcia's statements calls into question whether her determination that Plaintiff could return to PRW was supported by substantial evidence. Consequently, the ALJ's failure to explain her decision not to utilize the higher age category was not harmless error.

For the foregoing reasons, the undersigned cannot find that substantial evidence supports the Commissioner's step five finding and recommends reversal and remand for further development of the record. *See Brown v. Astrue*, C/A No. 3:07-2914, 2009 WL 890116, at *12 (D.S.C. March 30, 2009) (remanding case for development of record on the ALJ's determination of appropriate Grid rule in borderline age situation).

### 3.    Plaintiff's Remaining Allegations of Error

Because the undersigned recommends remand based on the ALJ's failure to consider Ms. Garcia's statements and failure to explain her decision to rely on Plaintiff's chronological age category at step five, Plaintiff's remaining allegations of error are not addressed. However, on remand, the undersigned recommends directing the ALJ to provide greater explanation for her treatment of the opinions of Ms. Grier and Dr. Ruffing, particularly her reliance on Plaintiff's continued work activity in light of Ms. Garcia's statements. The undersigned further recommends directing the ALJ to more fully explain her consideration of Plaintiff's obesity. Finally, the undersigned recommends directing the ALJ to adequately explain her RFC finding and to reconsider whether to include additional limitations in Plaintiff's RFC based on the step three finding of moderate mental limitation in concentration, persistence, or pace.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

December 5, 2012                                Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).